## UNITED STATES v. SMITH.

## UNITED STATES ex rel. SMITH v. CUSHING, United States Marshal.

District Court, S. D. Illinois, S. D. August 30, 1929.

Sylvester Rush, Asst. Atty. Gen., and Marks Alexander, Asst. U. S. Atty., Walter M. Provine, U. S. Atty., both of Springfield, Ill.

Hal M. Stone, of Bloomington, Ill. (Stone & Taylor, of Bloomington, Ill., of counsel), for respondent Smith.

FITZHENRY, District Judge. At the June term, 1928, of the United States District Court for the District of Massachusetts a grand jury returned an indictment against Harold A. Smith, impleaded with Guy Huston, Walter Cravens, Oran F. Schee, John E. Huston, John L. Boyles, and Vernon U. Sigler, charging them with having used the United States mails to defraud the public, and also with having entered into a conspiracy to commit divers offenses against the United States, to wit, violations of section 215 of the Penal Code (18 USCA § 338), and the commission of certain overt acts to effect the object of the conspiracy.

Defendant Smith resides at Galva, in the Southern district of Illinois. A warrant was sued out before Commissioner Moore, and the defendant was brought before him. At the hearing, a certified copy of the Massachusetts indictment was offered in evidence. The government then offered the testimony of two witnesses tending to identify the person in custody as the defendant named in the indictment, when the government rested. Thereupon the defendant offered considerable evidence, in his own behalf, in an effort to overcome the prima facie case made by the government.

The commissioner found there was "probable cause," and ordered the defendant Smith held for removal. A petition for an order of removal was filed, and at the same time a petition for a writ of habeas corpus was presented by Smith. The writ was granted, returnable on the day set for a hearing on the petition for removal, and both matters heard at the same time.

Under the Federal Farm Loan Act July 17, 1916 (39 Stat. 360), a number of joint-stock lands banks were organized in the years 1918, 1919, and 1920. The ones especially concerned in this inquiry are Chicago Joint Stock Land Bank, Southern Minnesota Joint

Stock Land Bank, Kansas City Joint Stock Land Bank, and the Des Moines Joint Stock Land Bank. The defendants named in the Massachusetts indictment were all officers of these various banks. Defendant Guy Huston was a substantial stockholder in them and the head of the Guy Huston Company, a corporation which was the fiscal agent for the several joint stock land banks named, as well as others. In the course of the operation of these joint-stock land banks, prior to 1925, each had accumulated substantial amounts of distressed loans, commonly referred to as "frozen assets." There had been many defaults on the part of the borrowers; mortgages had been foreclosed; numerous farms had been taken over by the banks; it was necessary to pay the taxes upon them; and an effort was being made by the banks to operate many of them.

In 1925, the Federal Farm Loan Board notified the banks that they must charge off and get rid of the "frozen assets" of this nature and substitute paper representing liquid loans in the hands of the registrar for those representing the "frozen assets" which had been deposited as security for certificates issued and sold against them. Each of the banks had organized subsidiary concerns, known as "Farm Companies" or "Farmers' Funds," to which the "frozen assets" had been apportioned. It is charged in the indictment that these "frozen assets" were worthless and known to be worthless by those conducting the banks.

The Federal Farm Loan Board had ordered that these so-called "Farm Companies" and "Farmers' Funds" be completely divorced from the banks. To accomplish this and to raise funds with which to meet the losses of the banks, a scheme was devised to organize a system of so-called "secondary financing corporations," to issue stock to be sold for the purpose of raising money to meet the losses sustained by the banks. The government claims, and the indictment charges, that the whole scheme was fraudulent, inasmuch as it was the purpose to cause the secondary financing corporations to purchase, at par value, with their funds when procured, the "frozen assets" which were worthless, and therefore the whole scheme was a fraud upon the public, to whom the stock in the secondary financing corporations was to be sold. We are chiefly concerned here with the connection of defendant Smith with this enterprise and incidentally the Southern Minnesota Joint Stock Land Bank of Redwood Falls, Minn.

Defendant Smith had been connected with a country bank for many years, at Galva, Ill. He and Guy Huston had been friends from childhood; he was a successful banker; at the instance of Guy Huston he was taken into the Chicago Joint Stock Land Bank and had been made its secretary. When the Southern Minnesota Joint Stock Land Bank, of which Guy Huston was chairman of the board of directors, was seriously threatened, early in the fall of 1925, by the Federal Farm Loan Board, Huston dispatched Smith, as his personal representative, to Redwood Falls to straighten it out and satisfy the Federal Farm Loan Board, as well as to advise Huston, in New York, of the amount of money which would be immediately needed to save the situation. After a few days, Smith reported to Huston, in New York, that a large sum of money would be necessary. The money was immediately raised and passed to the credit of the Southern Minnesota Joint Stock Land Bank with the Chase National Bank of New York, by Huston. Smith was then directed to go to Washington to interview the Federal Farm Loan Board, which he did, apparently satisfying the Board that the bank was now in good condition and the situation had been relieved. He was so successful that it caused one of the members of the Federal Farm Loan Board to write a letter to Guy Huston, as chairman of the board of directors, commending the work which had been done, and suggesting that Smith was a desirable man to be elected president of the bank; that, if he was elected, the Board would approve a salary for him to the extent of $12,000 per annum.

In the meantime, Guy Huston had set in motion the organization of the Massachusetts Farms Company, with a capital stock of $1,000,000, divided into classes, had had it underwritten by a bond brokerage firm as well as his own company, and preparations were made for putting the stock of the Massachusetts Farms Company upon the market. There were prepared, printed, and circulated prospecti, glowingly representing the possibilities of profits incident to this secondary financing corporation, suggesting that in all probability the entire investment of a purchaser would be repaid within five years, explaining that this system had long been contemplated, but had not been put into operation until now, and attached to these documents were blank applications to be signed by the subscribers and sent in to the bond brokerage concern in Boston. The efforts to dispose of the stock in this way were very largely confined to a use of the mails, originating at Boston, Mass.

The indictment is voluminous and takes up the frauds connected with the securing of subscribers to and the sales of the capital stock of several other so-called secondary financing corporations, some of which were formulated upon the same plan as the Massachusetts Farms Company, organized for the purpose of relieving particularly the Southern Minnesota Joint Stock Land Bank.

In the fall of 1925, a balance sheet of the "frozen assets" of the Southern Minnesota Joint Stock Land Bank, which had been set apart to the Farmers' Fund, was sent by Smith to Guy Huston in New York, for his information and use. This balance sheet enumerated the various items, giving the amounts of the primary loan and the amount which the bank had been required to advance in protecting itself and in husbanding the security. The amount directly shown to be involved was used by Huston in procuring brokers to underwrite the issue of stock in the new corporation, which was to be sold to the public, upon the theory that the original loan was never for a sum to exceed 40 per cent. of the appraised value of the several properties, and there was left the wide margin of 60 per cent. to cover the incidental cost of carrying the loans and to sustain a secondary financing operation.

In addition to a number of counts charging the defendants named with various substantive offenses under section 338, tit. 18, USCA (Criminal Code, § 215), there is also a count charging the defendants with having violated the conspiracy act, section 88, tit. 18, USCA (Criminal Code, § 37). The sufficiency of the indictment as a pleading is not attacked. The indictment sufficiently, for present purposes, charges that the offenses were committed within the district of Massachusetts. There can be no question but that the United States District Court of Massachusetts has jurisdiction of the offense. Defendant Smith very earnestly claims there is no evidence of probable cause to believe that he is guilty of the crimes charged, or any of them, and that is the material question. He claims he was not connected in any way with any scheme to defraud. If there was such a scheme, he knew nothing of it, and could not have intentionally participated in it; that, if there was such a conspiracy as is charged, he knew nothing of it, committed no overt act of any kind connected with it, or the furtherance of it, a fortiori, it is urged, no overt act of any other person could be binding upon him. In other words, defendant Smith claims that he is not guilty of any or either of the crimes charged, and that the evidence sustains that fact.

An indictment is legal evidence, in a removal proceeding, to establish prima facie the commission of the crime or crimes charged, in manner and form as charged, and by the persons charged.

It was not expressly admitted before the commissioner, but was sufficiently proved, that the defendant Smith arrested and appearing at the hearing and the defendant Smith named in the indictment are one and the same person; this fact was substantially admitted upon the hearing before the court.

At the bar it was seriously complained that the commissioner failed and refused to consider competent evidence offered on behalf of defendant. The record is now before us, and it shows that the evidence was received, and, whether considered by the commissioner or not, it is now before the court.

It is the duty of the commissioner or judge, upon a hearing of this character, to hear and consider any evidence offered on behalf of a defendant which tends to show a lack of probable cause to believe that the defendant is guilty of the crimes charged. The issue is the presence or lack of probable cause, not, guilty or not guilty. Nevertheless, if it can be shown to the court affirmatively by a defendant that he is not guilty and could not be guilty of the offense charged, without the court being required to determine controverted questions of fact, there would consequently be no probable cause.

When a duly organized grand jury meets, considers a case, and returns an indictment, it is presumed that the grand jury heard competent legal evidence tending to sustain every material allegation of fact contained in the indictment, and when, in a removal proceeding, such an indictment is offered in evidence, it is prima facie proof of those facts, and must be accepted as such. When an attempt is made to rebut and overcome the prima facie case made by the indictment as an instrument of evidence, the evidence must be clear and convincing, and must not involve or require, of the court or committing magistrate, the settling of controverted questions of fact, nor the determining of the credibility of witnesses. United States v. Moore (D. C.) 7 F.(2d) 734. In other words, it must be clear to the court as a matter of law that there is no probable cause. Proof of facts which raise only a possibility of doubt are insufficient.

Judge Evans, of this circuit, in discussing this question, said: "This probable cause is ordinarily established by the indictment, and when an indictment is presented the burden shifts to the defendant to overcome the prima facie case thus disclosed. In fact, it is much

more than a mere prima facie case. *It requires a strong case on the part of the accused to justify a finding of no probable cause.*" United States ex rel. Steneck et al. v. Levy, U. S. Marshal, 3 F.(2d) 816, 817.

There are, in the law, "prima facie cases" which may be overcome by slight evidence, in various positions where they are found, but, in a case of this kind, when the burden shifts to the defendant, it involves proof by him that is clear and convincing that there is no probable cause. Does the proof offered on behalf of the defendant overcome the prima facie case and show that there is "no probable cause?"

The uncontroverted evidence of the indictment shows: (1) That schemes to defraud by the use of the mails were devised and their execution attempted; (2) that there was a conspiracy to commit an offense against the United States by the use of the mails to defraud. And there is no evidence before the court to overcome these two established facts. Prima facie, defendant Smith was a party to the schemes to defraud and to the conspiracy.

The chief evidence relied upon to show no probable cause is the testimony of the defendant himself, who submitted to a very full examination in chief, and for whom no objection was made to almost unlimited cross-examination. If there was any scheme to defraud, or a conspiracy, according to his testimony, he did not know it; therefore there was no intention to violate section 215, as charged, and no complicity in the conspiracy, or knowledge of it, which would take him into it, so that he might be bound by the overt acts of others. The evidence, offered on behalf of defendant, by which he seeks to overcome the prima facie case of the government, and asks the court to find that there is no probable cause, involves "knowledge" and "intent" on the part of defendant Smith. The indictment sufficiently charges knowledge and intent on behalf of all of the defendants named. Defendant Smith takes the position that there was no scheme to defraud and no conspiracy; yet, if there was, he knew nothing of any or either of them.

The court is bound to assume there must have been some evidence to the contrary offered before the grand jury upon this vital point, and such a question is involved as can only be determined by the trial court, with the aid of a jury, and cannot and should not be attempted upon a hearing of this kind.

In Chapin v. Walker, U. S. Marshal, 8 F.(2d) 991, 992, Judge Walker, speaking for the Court of Appeals for the Fifth Circuit, used this language: "The rule that evidence of probable cause afforded by the indictment may be rebutted by other evidence (Tinsley v. Treat, 205 U. S. 20, 27 S. Ct. 430, 51 L. Ed. 689) cannot be given the effect of enabling a habeas corpus tribunal, in passing on the validity of a removal order, to exercise the functions of the trial court, which has jurisdiction to try the accused on the criminal charge made against him. Henry v. Henkle, 235 U. S. 219, 35 S. Ct. 54, 59 L. Ed. 203. *The appellant's denials under oath of his guilt were not enough to overcome the prima facie evidence afforded by the indictment of probable cause for believing him guilty of the offense charged, and to warrant a finding against the validity of the removal order.*"

The commissioner, as well as the judge, considering an application for an order of removal of a defendant to another district, sits as a committing magistrate. The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to a later trial, and not to determine whether the evidence is sufficient to justify a conviction. Collins v. Loisel, U. S. Marshal, 259 U. S. 309, 42 S. Ct. 469, 66 L. Ed. 956.

Defendant has cited the case of United States v. Andrade et al., 10 F.(2d) 572, 576, on a number of legal propositions appropriate for consideration in a case of this character. That case was heard by Judge Hutcheson in the Northern District of Texas, and what he said in that case is especially appropriate here:

"I think it must be conceded that the defendant's evidence powerfully shakes the prima facie case made by the indictment, and, were it not for the essentially personal character of the guilt charged, and of the defendant's attempted exculpation from that guilt, grave doubt might and ought to arise whether probable cause for the prosecution exists, for he has met every accusation with an explanation of the circumstances under which he did and said the things which he did and said, which, if accepted as true, would be inconsistent with his guilt.

"The difficulty, however, is that, stripped of all of its involvement, the offense with which he is charged is one entirely of intent. If his intent was honest, nothing which he is charged with doing was wrong. If dishonest, * * * everything he did was wrong.

"The defendants seem to believe that they have met the burden cast on them by the fact of the indictment by having the defendant testify to facts which, if coupled with an

honest intent, would acquit him, but which, if coupled with a dishonest intent, would convict him, for there is enough of circumlocution and of concealment in the case to make a case of guilt, if the purpose of the man was dishonest, while there is enough of explanation for these transactions to make a case of innocence, if his purpose was honest.

"Viewing the whole case, I am of the opinion that the prima facies raised by the indictment are not legally rebutted and that a finding of no probable cause cannot, in the face of the indictment, be made by me."

The defendant complains, that the indictment is now returned to the District Court of Massachusetts, and it is a hardship upon him to be required to go to Massachusetts to interpose his defense. A similar contention was made in United States v. Andrade, supra, where it was sought to remove defendants from Texas to California for trial. Judge Hutcheson said: "Such considerations, however, are addressed to, and should be determined by, the prosecuting, rather than the judicial, branch of the government and can have no legitimate influence upon my determination of the question of probable cause further than that a consideration of this hardship upon the defendants compels me to consider as highly substantial their application for relief from a removing order."

With reference to the conspiracy count: The present record discloses affirmatively a very close relationship between Guy Huston, John E. Huston, and defendant Smith; that, when trouble became apparent to the Southern Minnesota Joint Stock Land Bank, Smith was sent to handle the situation; summary action was diverted by Huston passing to the credit of the Southern Minnesota Joint Stock Land Bank a substantial sum of money, in the Chase National Bank of New York. A new company was organized, to sell stock to raise money, and the Southern Minnesota Farmers' Fund was being divorced from the Southern Minnesota Joint Stock Land Bank. It is apparent that the funds were raised, or to be raised, by subscription to the stock of the Massachusetts Farms Company, with no assets, except the frozen and alleged worthless ones, which were being transferred, in effect, from the Southern Minnesota Joint Stock Land Bank, of which Smith was president, to the Massachusetts corporation.

A conspiracy may be established by circumstantial evidence, or by deductions from facts proved. Allen v. United States (C. C. A). 4 F.(2d) 688, 691. It is seldom that parties entering into criminal conspiracies do so in writing or so openly that affirmative proof of it is readily available. Consequently the question may be determined by a jury either upon circumstantial evidence, or by deductions from other facts and circumstances.

Judge Evans, speaking for the court, in the Allen Case, supra, makes this pertinent observation: "The common design is the essence of the crime, and this may be made to appear when the parties steadily pursue the same object, whether acting separately or together, by common or different means, but ever leading to the same unlawful result. If the parties acted together to accomplish something unlawful, a conspiracy is shown, even though individual conspirators may have done acts in furtherance of the common unlawful design apart from and unknown to the others. All of the conspirators need not be acquainted with each other. They may not have previously associated together. One defendant may know but one other member of the conspiracy. But if, knowing that others have combined to violate the law, a party knowingly co-operates to further the object of the conspiracy, he becomes a party thereto."

In the light of those considerations, the court does not feel warranted in finding that no probable cause exists, in the face of the indictment as an instrument of evidence and the testimony of witnesses. Questions of intent and lack of knowledge, which constitute an important part of defendant's opposition to the removal order, are such as should be determined by a jury, upon a full trial.

The writ of habeas corpus will be denied, and the petitioner, defendant Smith, will be remanded to the custody of the marshal. The warrant for removal to the district of Massachusetts will be granted.